HARRINGTON MANUFACTURING CO., INC. v. LOGAN TONTZ COMPANY
AND TRIAD METAL PRODUCTS COMPANY

No. 786SC377

(Filed 3 April 1979)

1. **Uniform Commercial Code § 23— justifiable revocation of acceptance—burden of proof**

Once goods have been accepted by the buyer, he is thereafter precluded from rejecting them, G.S. 25-2-607(2), and when he revokes his acceptance, the

Manufacturing Co. v. Logan Tontz Co.

*burden is on him to show that such revocation was justifiable.* G.S. 25-2-607(4); G.S. 25-2-711(1).

**2. Uniform Commercial Code § 23— justifiable revocation of acceptance—showing required**

In order for the buyer to show that his revocation of acceptance of goods was justifiable, he must prove the following four elements: (1) that the goods contained nonconformity that substantially impaired their value to him, G.S. 25-2-608(1); (2) that he either accepted the goods knowing of the nonconformity but reasonably assuming that it would be cured, G.S. 25-2-608(1)(a), or that he accepted the goods not knowing of the nonconformity due to the difficulty of discovery or reasonable assurances from the seller that the goods were conforming, G.S. 25-2-608(1)(b); (3) that revocation occurred within a reasonable time after he discovered or should have discovered the defect, G.S. 25-2-608(2); and (4) that he notified the seller of his revocation, G.S. 25-2-608(2).

**3. Uniform Commercial Code § 23— revocation of acceptance—reasonable time—factors considered**

In determining whether revocation was made within a reasonable time after the buyer discovered or should have discovered a nonconformity, it is proper to consider all the surrounding circumstances, including the nature of the defect, the difficulty of its discovery, the complexity of the goods involved, and the sophistication of the buyer.

**4. Uniform Commercial Code § 23— revocation of acceptance—reasonable time—jury question**

What is a reasonable time for a buyer to revoke his acceptance is ordinarily a question of fact for the jury.

**5. Uniform Commercial Code § 24— justifiable revocation of acceptance—sufficiency of evidence**

Plaintiff's evidence was sufficient to permit a jury finding that plaintiff justifiably revoked its acceptance of latches ordered from defendant for use in tobacco barns made by plaintiff where it tended to show that defendant offered to manufacture latches made like samples submitted to plaintiff for a certain price; plaintiff initially ordered 500,000 of the latches and later ordered an additional 250,000 latches; the latches were used by plaintiff in manufacturing its tobacco barns and were later found to be unsatisfactory because they would not hold loaded tobacco racks; the latches did not conform to the models submitted by defendant to plaintiff; and plaintiff notified defendant of the problem with the latches within 24 hours after plaintiff discovered that a problem existed.

**6. Uniform Commercial Code § 22— revocation of acceptance—damages for "cover" and incidental expenses**

Plaintiff's evidence was sufficient for the jury to find that, after it revoked its acceptance of latches ordered from defendant, it properly "covered" in procuring substitute latches for those ordered from defendant and that it was entitled to damages for the cost of effecting "cover" as well as incidental and consequential damages it incurred in shipping the latches back to defendant,

for amounts paid to farmers for the replacement of the latches in tobacco barns made by plaintiff, for labor to install the new latches in the barns, and for transportation of the replacement latches to farmers and dealers. G.S. 25-2-712(1) and (2).

APPEAL by defendant Triad Metal Products Company from *Martin (Perry), Judge.* Judgment entered 27 October 1977 in Superior Court, NORTHAMPTON County. Heard in the Court of Appeals on 1 February 1979.

This is a civil proceeding wherein plaintiff seeks to recover damages in excess of $300,000 based on breach of a contract pursuant to which the defendant was to manufacture and sell to plaintiff a special type of latch used in the construction of tobacco barns. The defendant Triad Metal Products Company counterclaimed for $47,083.36 damages for the failure of plaintiff to pay for all of the latches it ordered. The defendant Logan Tontz Company was voluntarily dismissed prior to trial. The relevant facts in this complex lawsuit are as follows:

Plaintiff is a North Carolina corporation engaged primarily in the manufacture of various types of farm equipment and industrial machinery. Defendant is a metal stamping company located in Cleveland, Ohio, that makes parts for automobiles, appliances and other manufactured goods. One of the plaintiff's products is a bulk tobacco curing barn. This type of barn is designed to hold racks on which green tobacco is placed for curing. The tobacco is picked in the field and loaded onto the racks and the loaded racks are then placed in the barns. The later models of this barn contain three tiers of racks. Each barn holds 126 racks. Each rack consists of two separate pieces, one of which has several long nails or tynes that hold the tobacco leaves. These two components are held together by a piece called a latch or a latch spring, there being two latches for each rack, one on each side. The latches are designed to snap into place and fit onto a latch guide or sleeve in the barn.

In February of 1974, Mr. Logan Tontz of Triad Metal Products contacted Mr. George Britton of Harrington Manufacturing Company and they discussed the possibility of the defendant manufacturing the latches for the barns made by the plaintiff. Mr. Tontz was provided a drawing of the latch that was then being manufactured by plaintiff and used in the barns. He was also pro-

vided with one of the latches that plaintiff had manufactured. On 9 May 1974, defendant delivered 25 latches for examination and testing to plaintiff. On 22 May 1974, Harrington ordered an additional 550 of these latches, 275 to be 3/4″ wide and 275 to be 7/8″ wide, all to be 1/8″ longer than the first 25 latches sent but having the same thickness of .062 inches. The latches ordered were in all other respects identical to the original 25 latches provided by the defendant. The 550 latches were received on 28 June 1974 and were field tested on tobacco racks by the Harrington Engineering Department. These tests proved to be successful and this was communicated to Triad.

On 10 July 1974, defendant sent the following letter to Harrington:

Dear Mr. Britton:

We recently submitted samples to you on the subject part made of 7/8″ wide material and .062 thick. Our representative, Mr. Logan Tontz, has requested that we quote on manufacturing this part for you made like the samples we submitted, mentioned above, and we quote as follows:

$125.15/M — 100,000 piece lots
$124.80/M — 250,000 piece lots
$124.70/M — 500,000 piece lots
$124.65/M — 1,000,000 piece lots

Tool cost: $3175.00
Delivery: 8-10 weeks

Our terms are f.o.b. our plant, Cleveland, Ohio. Net 10 days for tools and net 10th and 25th for production.

The above quotation is based upon making these parts, as previously stated, out of 7/8″ wide material, .062″ thick, SAE 1070 Annealed Spring Steel and heat treated to Rockwell C48 and with a phosphate and oil finish.

We hope you find the above attractive and that we may have an opportunity to supply this part to you.

Sincerely yours,

R. L. Steinheiser

On 12 August 1974, plaintiff placed an order for 500,000 of the 7/8″ wide latches with defendant using part #6983 (Triad #78159). Subsequently, Triad sent a letter dated 13 August 1974, confirming this order, which stated:

Dear Mr. Britton:

Confirming your conversation with our representative, Mr. Logan Tontz, we are entering your purchase order number 11395 for the tooling and 500,000 pieces of the subject part as quoted July 10, 1974.

Per Mr. Tontz's request, we are enclosing herewith a copy of the print of the subject part which coincides with the last samples we made for you on this part and which were approved.

We wish to thank you very much for this order and the opportunity to manufacture this part for you.

Sincerely yours,

R. L. Steinheiser

A detailed design print of a latch was also sent with this letter.

When the latches from the defendant were received, Harrington ceased its production of latches and began using the Triad latches. On 28 January 1975, Harrington ordered an additional 250,000 latches. After manufacturing approximately 1,000 barns using over 250,000 Triad latches, Harrington began receiving complaints in late February that the racks would not hold when weighted down. Harrington notified defendant of the problem with the racks not holding within 24 hours of receiving complaints and immediately ceased using the Triad latches and resumed production of its own latches on an emergency basis. On 14 March 1975, Harrington paid Triad $14,377.04 on account for shipments of the latches, bringing the total amount paid for the latches to $35,748.64. After that, Harrington made no further payments to Triad and returned, at the request of Triad, all the unused latches that had been shipped to it. Harrington had received 638,789 latches from the defendant pursuant to its shipment orders.

At trial, Harrington introduced evidence tending to show that Triad did not send a drawing or diagram of any latch for ap-

proval prior to 12 August 1974, the date on which Harrington sent its purchase order for 500,000 latches; that prior to 12 August 1974, Triad had sent only the two sets of samples, one of 25 and one of 550, that had been successfully field tested by Harrington; and that the production latches sent were not like these samples, but if they had been they would have worked; that the latches manufactured by Harrington were tested and withstood a load of 600 pounds without pulling out of the latch guides, but that the latches manufactured by Triad failed to hold with loads ranging from 150 to 590 pounds; that when loaded with tobacco, the racks would weigh between 250 and 300 pounds; and that the order from Harrington was placed before the 13 August 1974 drawing was in existence. With regard to the issue of damages, Harrington presented evidence tending to show that it paid Triad $35,748.64 on the account for the latches that were delivered; that the cost to Harrington of manufacturing 750,000 latches to replace the ones made by Triad is $281,250.00; that it incurred $6,750.00 in labor expenses for replacing the latches; that it paid $6,749.00 to farmers and dealers for replacing latches; and that it incurred $3,000 expenses for transporting the latches to dealers and farmers.

Defendant presented evidence tending to show that Harrington's order on 12 August 1974 for 500,000 latches was not based on the earlier samples that had been submitted, but rather on the basis of information forwarded by Mr. George Britton of Harrington and transmitted to Mr. Elmer Reidel of Triad, who designed the die for the latches made by Triad, that this information concerned a reduction in the angle of a bend or detent in the latch, which was incorporated into the design and finalized in the drawing dated 13 August 1974, which accompanied the letter of even date sent to Harrington confirming the purchase order; and that the latches made by Triad conformed to the drawing dated 13 August 1974, and not to the original samples. With regard to its counterclaim, Triad presented evidence tending to show that Harrington had a current indebtedness of $32,722.40 to Triad for the latches delivered to it, and that Harrington had been regularly billed each month for this balance on their account.

At the close of all the evidence, plaintiff's motion to dismiss the counterclaim of the defendant on the grounds that no

evidence was introduced that Harrington was indebted to defendant in any amount was allowed by the trial court.

The following issues were submitted to and answered by the jury as indicated:

1. Did the defendant expressly warrant to manufacture the latches and deliver the same in accordance with the samples submitted?

Answer: Yes

2. If so, did the defendant materially breach its express warranty to the plaintiff?

Answer: Yes

3. If the defendant materially breached its express warranty to the plaintiff, what amount of damages, if any, is plaintiff entitled to recover?

Answer: $42,498.64.

After the jury had returned its verdict, the plaintiff moved to set aside the verdict as to the third issue as being against the greater weight of the evidence. The court allowed this motion and entered an order that a new trial be held as to the third issue only. Defendant appealed.

*Pritchett, Cooke & Burch, by Stephen R. Burch and William W. Pritchett, Jr., for plaintiff appellee.*

*Turner, Enochs, Foster & Burnley, by James R. Turner, and Allsbrook, Benton, Knott, Cranford & Whitaker, by Thomas I. Benton, for defendant appellant.*

HEDRICK, Judge.

The issues submitted to and answered by the jury do not resolve the controversy between the parties disclosed by the evidence. While warranties are involved, the issues raised by the evidence are more complex and involve principles of law either not considered or incorrectly applied by the trial court. Since the error appearing in this record has been only indirectly raised and discussed by the defendant in its brief, it is unnecessary for us to discuss separately each of its several assignments of error in this opinion. We confine our discussion to what we perceive to be the issues raised by the evidence in this record and the correct application of the several principles of law thereto.

[1, 2] Once goods have been accepted by the buyer, he is thereafter precluded from rejecting them, G.S. § 25-2-607(2), and when he revokes his acceptance, the burden is on him to show that such revocation was justifiable before he will be allowed to recover. G.S. §§ 25-2-607(4), -2-711(1). In order for the buyer to show that his revocation was justifiable, the following four elements must be proved: (1) that the goods contained a nonconformity that substantially impaired their value to him, G.S. § 25-2-608(1); (2) that he either accepted the goods knowing of the nonconformity but reasonably assuming that it would be cured, G.S. § 25-2-608(1)(a), or that he accepted the goods not knowing of the nonconformity due to the difficulty of discovery or reasonable assurances from the seller that the goods were conforming, G.S. § 25-2-608(1)(b); (3) that revocation occurred within a reasonable time after he discovered or should have discovered the defect, G.S. § 25-2-608(2); and (4) that he has notified the seller of his revocation, G.S. § 25-2-608(2). *See also Performance Motors, Inc. v. Allen*, 280 N.C. 385, 186 S.E. 2d 161 (1972); *Davis v. Vintage Enterprises, Inc.*, 23 N.C. App. 581, 209 S.E. 2d 824 (1974); 2 Anderson, Uniform Commercial Code § 2-608:4 (2d ed. 1971); 3 Williston on Sales, § 25-6 (4th ed. 1974); Annot., 65 A.L.R. 3d 388 (1975).

[3, 4] Under G.S. § 25-2-106(2), goods are " 'conforming' or conform to the contract when they are in accordance with the obligations under the contract." Furthermore, the existence of any express or implied warranties would be relevant to show the standard to which the goods were supposed to conform. *See* G.S. § 25-2-313(1). In determining whether revocation was made within a reasonable time after the buyer discovered or should have discovered the nonconformity, it is proper to consider all the surrounding circumstances, including the nature of the defect, the complexity of the goods involved, the sophistication of the buyer, and the difficulty of its discovery. G.S. § 25-1-204(2); 2 Anderson, Uniform Commercial Code § 2-608:20 (2d ed. 1971); Annot., 65 A.L.R. 3d 354, 360-61 (1975). Indeed the reasonable time period may extend in certain cases beyond the time in which notice of the nonconformity has been given, as for example where the parties make attempts at adjustment. *Dopieralla v. Arkansas Louisiana Gas Co.*, 255 Ark. 150, 499 S.W. 2d 610 (1973); 2 Anderson, Uniform Commercial Code § 2-608:19 (2d ed. 1971); Comment 4 of the Official Commentary to G.S. § 25-2-608. What is a reasonable

time for a buyer to revoke his acceptance is ordinarily a question of fact for the jury. *See Four Sons Bakery, Inc. v. Dulman*, 542 F. 2d 829 (10th Cir. 1976).

Plaintiff's evidence with regard to the nonconformity element in G.S. § 25-2-608(1) tended to show the following:

[5]   Plaintiff supplied defendant with one of the latches that it manufactured for its barns and with a drawing of the latch; that defendant represented that it could manufacture a better latch at a cheaper price; that defendant had knowledge of how the latch was to be used; and that plaintiff relied on the defendant's representations as to their ability to design and manufacture a latch suitable for use in the plaintiff's barns. Plaintiff's evidence also tended to show that defendant manufactured and submitted model latches to the plaintiff for testing; that plaintiff tested these models and found them to be satisfactory; that defendant offered to manufacture latches "made like the samples we submitted" and quoted a price to plaintiff; that plaintiff initially ordered 500,000 of the latches and later ordered an additional 250,000 latches; that the production latches were used by the plaintiff in manufacturing the barns and were found to be unsatisfactory because they did not hold the loaded racks; and that the production latches did not conform to the models submitted. With regard to the notice element, plaintiff's evidence tended to show that once it discovered that a problem existed with the latches not holding the racks, it notified the defendant of the problem within twenty-four hours.

This evidence raises the threshold issue whether the plaintiff justifiably revoked its acceptance of the latches purchased from the defendant. Before the plaintiff is entitled to recover any damages, it must first prevail on this issue. From the evidence introduced, a jury could find that the plaintiff did justifiably revoke its acceptance of the latches. If a jury did find such a revocation of acceptance, then, under G.S. § 25-2-711(1), plaintiff would be entitled to recover the amount of the contract price it has paid for the goods involved. In addition to allowing the recovery of so much of the purchase price as has been paid, G.S. § 25-2-711 provides additional remedies for the buyer upon a justifiable revocation of acceptance. Under G.S. § 25-2-711(1)(a) the buyer is entitled to "cover" by procuring substitute goods for those found to be nonconforming.

In order to employ the remedy of "cover," the buyer must meet the requirements set out in G.S. § 25-2-712(1). First, there must have been a breach of the contract, and the seller must have either repudiated the contract or failed to deliver the goods, or the buyer must have rightfully rejected or justifiably revoked his acceptance of the goods. Second, the buyer must have acted in good faith and without unreasonable delay in procuring the substitute goods. Finally, the replacement goods must be a reasonable substitute for those the buyer contracted to purchase. 3 Williston on Sales § 25-11 (4th ed. 1974); Annot., 64 A.L.R. 3d 246 (1975). With regard to the second element, a merchant buyer is held to a good faith standard of "honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade." G.S. § 25-2-103(1)(b).

[6] Plaintiff's evidence in the present case tends to show that the latches used in the barns were specially designed and unique, that the plaintiff had previously manufactured the latches it needed, and that once the problem was discovered, it immediately ceased using the defendant's latches and resumed production of its own latches on an emergency basis since it needed them to continue production of the barns. Thus, the second issue raised by plaintiff's evidence is whether it properly "covered" by procuring substitute latches for those purchased from the defendant.

If the plaintiff can establish that it properly "covered" under G.S. § 25-2-712(1), then it is entitled to such damages as it can prove, measured by the difference between the cost of "cover" and the contract price, together with any incidental or consequential damages. G.S. § 25-2-712(2). Incidental damages are defined in G.S. § 25-2-715(1) as including "expenses reasonably incurred in inspection, receipt, transportation and care and custody of goods rightfully rejected, any commercially reasonable charges, expenses or commissions in connection with effecting cover and any other reasonable expense incident to delay or other breach." Consequential damages include losses resulting from the buyer's requirements which were reasonably foreseeable and which could not have been prevented by "cover." G.S. § 25-2-715(2). *See also* 2 Anderson, Uniform Commercial Code §§ 2-715:15, 16 (2d ed. 1971); 3 Williston on Sales § 25-12 (4th ed. 1974).

In the present case, the plaintiff's evidence would permit the jury to award it damages for the cost of effecting "cover" as well

as incidental and consequential damages for expenses it incurred in shipping the latches back to the defendant, for amounts paid to farmers for replacement of the latches, for labor furnished so that the new latches could be installed in the barns, and for transportation of the replacement latches to the farmers and dealers.

If, on the other hand, the jury should conclude that the plaintiff did not justifiably revoke its acceptance, it would then consider the issue raised by the defendant's counterclaim and the evidence, i.e., whether the plaintiff is liable for the balance of the purchase price of the latches. Defendant alleged in its counterclaim that plaintiff was liable to it for the amount remaining on the contract price, and its evidence tended to show that it had regularly billed the plaintiff for this balance, which amounted to $32,722.40. Under G.S. § 25-2-607(1), the buyer is obligated to pay at the contract rate for any goods which it has accepted. If the jury should determine that the plaintiff accepted the latches and did not effectively revoke its acceptance, then the plaintiff would be liable for this balance.

For the reasons stated above, the entire verdict is set aside, and the Order awarding a new trial on the issue of damages is vacated, and the cause is remanded to the superior court for a new trial on all issues.

Vacated and remanded.

Judges VAUGHN and CLARK concur.