**EPN–DELAVAL, S.A., Plaintiff,**

v.

**INTER–EQUIP, INC., Third-party plaintiff,**

v.

**ALLOY PRODUCTS CORPORATION, Third-party defendant.**

**Civ. A. No. H–78–2426.**

United States District Court, S. D. Texas, Houston Division.

April 21, 1982.

Judgment for defendant.

William L. Burnett, Wheat, Thornton & Burnett, Houston, Tex., for plaintiff.

Arteus M. Clay, Houston, Tex., for defendant.

Robert A. Markowitz, Houston, Tex., for third-party defendant.

## MEMORANDUM OPINION AND ORDER

McDONALD, District Judge.

This is a suit for damages resulting from breach of contract. Plaintiff, EPN–Delaval, S.A. (hereinafter EPN), is a Mexican Corporation which manufactures oil industry equipment primarily for Pemex, the national petroleum company of Mexico. In 1977 Pemex ordered six refinery vessels, called separators, for liquid and gas crude oil products from EPN. To perform under its contract with Pemex, EPN ordered six hemispheric caps or lids called heads for the separators from defendant Inter-Equip, Inc., a Texas corporation doing business in Houston. The heads are ten-ton steel plates which are welded to the ends of the separators. Defendant Inter-Equip ordered heads from third-party defendant, Alloy Products Corporation, also doing business in Houston, which in turn ordered them from the manufacturer, Phoenix Steel Corporation, not a party to this action. Plaintiff received six heads but they were elliptical not hemispheric in shape. The issue for this Court is whether defendant or third-party defendant is liable for damages because of delivery of the non-conforming heads.

### Facts

The resolution of this dispute requires an understanding of the differences between a hemispheric and an elliptical head. Plaintiff's witness, Angel Leon [1] diagramed the heads, following Plaintiff's Exhibit No. 30, as follows:

---

1. Angel Leon is the Technical Director of EPN–Delaval, and a chemical engineer who, as general production manager of EPN, S.A. for fifteen years oversaw the manufacture of separators and the order and installation of heads.

**HEMISPHERIC**

**ELLIPTICAL**

He explained that the hemispherical head has a one to one proportion of radius to height and is approximately twice as high as the elliptical head. The greater height enables it to withstand a given pressure with one half the thickness of an elliptical head. Thickness of a head is measured by the external diameter, or "O.D." dimension, minus the internal diameter, or "I.D.", dimension. An elliptical head of a given "I.D." must be twice as heavy as a hemispherical head of the same dimension to withstand the same pressure. A hemispherical head is, therefore, more economical than an elliptical one. Straight flange, abbreviated "S.F.", indicates the length of the skirt of the head, and is a necessary specification for an elliptical head but a "slightly unusual" one for a hemispherical head.

According to plaintiff, there is a visible difference between the heads which is open and obvious to technologically knowledgeable people. Mr. Leon testified that although it is not necessary to be an engineer to differentiate between the two types of heads, the difference might not be perceived by someone without technical knowledge. Mr. Heiman, the third-party defendant Alloy employee who ordered the heads from Phoenix, testified that he could not distinguish a hemispherical from an elliptical head, that he could see a difference in their shapes but did not know which head was which.

The sale originated with EPN's oral request, to Inter-Equip's agent in Mexico, Jesus Vilchis, for a quotation for separator heads to withstand a given amount of pressure. They were not a stock item of standard size, weight, or thickness, but a special order. On October 10, 1977, Inter-Equip sent a telex to Mr. Vilchis in Mexico, requesting him to deliver a quotation for the heads to EPN (Defendant's Exhibit No. 1). The telex included specifications for "O D," thickness and "S F," but did use the words hemispherical or elliptical.

Inter-Equip is a middle man, between buyer and manufacturer, and most of its business is in Mexico. It represents manufacturers in international sales of industrial equipment such as pipe valves, compressor and pump parts, underwater connectors and raw materials. Prior to the contract in this case, Inter-Equip had filled six or seven separator head orders for other customers. It had sold other products to plaintiff EPN, and its agent, Mr. Vilchis, had dealt previously with EPN. It had not, however, ordered heads from third-party defendant Alloy.

Inter-Equip's former bookkeeper and accountant, who handled purchasing, shipping and receiving, Sharon Sharp, testified that Inter-Equip was confused as to whether EPN requested elliptical or hemispherical heads. She stated generally that when she received telexes or other messages from

Mexico in Spanish, she consulted Mr. Arthur W. Hernandez, Inter-Equip's President, for a translation, and she believed in this case there was a difficulty in translation, that Inter-Equip first understood that EPN wanted elliptical heads, found out that it wanted hemispherical heads, and changed its request for a quotation from Alloy accordingly. However, Ms. Sharp testified specifically that Mr. Hernandez instructed her regarding EPN's order to change the O.D. to an I.D. dimension, without explaining why, and that she telephoned Heiman to make this change and "other changes in the description," but that she does not recall whether she used the words elliptical or hemispherical at that time. Mr. Hernandez also testified that the changes EPN made in its order were specifically in the size, amounts and delivery of the heads.

Alloy's former employee, Charles Heiman, testified that he received Sharp's first request for a quotation for elliptical heads, consulted an office chart which indicated he needed a straight flange dimension, and telephoned Ms. Sharp, who gave him a S.F. measurement of two inches. He then inquired of Phoenix as to delivery date and price, and gave Inter-Equip a quotation on October 18, 1977[2] which read, in relevant part,

Ellip. Heads 163″ O D × 1⅛″ Min. 2″ S F . . . . Wt. 11237 # Each at . . . 5958

(Alloy's Exhibit No. 1). He testified further that Sharp telephoned him a second time to change the dimension from 163 "O.D.", to 163 "I.D.", and that she stated everything else was the same. He consequently obtained a second price quote from Phoenix. On October 19, the next day, he telephoned that quote to Sharp, who told him that he did not have to make a written memorandum of the change because she would amend her copy of Alloy's original written quotation herself. Heiman made the changes in dimensions, weight and price on his own copy of Alloy's price quote (Third-party Defendant's Exhibit No. 2).

Sharp apparently did not change Alloy's written quotation for heads but wrote on Inter-Equip's copy of its telex to Mexico (Defendant's Exhibit No. 1), "new quote 10/19/77." Similarly, Hernandez testified that he wrote on the telex "should be ID." The amended telex does not indicate, by deletion of the "S.F." dimension or otherwise, a change in the order from elliptical to hemispherical heads.

On November 2, Sharp placed an order for heads with Alloy over the telephone. Alloy testified that it does not require customers to acknowledge receipt of its quotations. When a buyer accepts Alloy's written quotation, its normal practice and policy is to take even large orders, orally or in writing, and to type the invoice from its quotation. Alloy understood Inter-Equip's telephone order to be its final order, and on the basis of it, Mr. Heiman wrote out a purchase order to Phoenix Steel, requesting

Ellip. Heads 163″ I.D. × 1⅛ M.T. 2″ Str. Flg . . . . . [at unit price of] 5590.

According to Spears, Alloy's president, Alloy obtains as credit information a financial statement, a Houston Associates of Credit Managers rating, and a Dunn and Bradstreet rating, and the latter two ratings, if favorable, are sufficient. Otherwise it requires a bank statement and three credit references. In the case of Inter-Equip, Alloy had, two months earlier, received a one hundred dollar order and it obtained three credit references from Sharp.

The Court concludes that the changes in the oral purchase order were limited to the size and price of the heads and that Inter-Equip did not change its order from one for elliptical to one for hemispheric heads over the telephone. The change from 162″ O.D. to 163″ I.D. had the effect of increasing the size and cost of the heads. The thickness was not changed. Because hemispheric heads are lighter and more economical than elliptical heads, Alloy could not have inferred from this change alone that a change from an order for elliptical to one for hemi-

---

**2.** Roger Spear testified that his wife who is also his secretary hand-carried Alloy's first quota-
tion to Ms. Sharp.

spherical heads. Moreover, the Court finds that third-party defendant Alloy was justified in acting on defendant's oral purchase order as a final order.[3]

On November 2, 1978, subsequent to the telephone order, Inter-Equip prepared a written purchase order for Alloy. (Plaintiff's Exhibit No. 4; Third-party Defendant's Exhibit No. 7) which describes the heads as,

"163″ ("13′ 7″) I.D. Hemispherical ASME HEAD × 1⅛″ Min. Thickness."

There was a conflict in the testimony regarding third-party defendant Alloy's receipt of this written order. According to Sharp, on October 21, 1977, after Inter-Equip had placed the oral order with Alloy, it received a written purchase order from EPN (Plaintiff's Exhibit No. 2) which requested six "13′ 7″ I.D. HEMISPHERICAL ASME HEAD 1⅛″ MIN THK." On the basis of it, Sharp typed a written purchase order to Alloy. It carried the instruction to ship to "Your warehouse and notify Sharon at 772–1977 upon arrival," gave as delivery date "No earlier than Jan. 15, 1978 and no later than Jan. 28, 1978" and, in compliance with EPN's requirement that Inter-Equip include with its letter of credit, invoice and the bill of lading, the material test report (Defendant's Exhibit No. 14) and the manufacturer's partial data report (Defendant's Exhibit No. 10; Plaintiff's Exhibit No. 9), stated

PLEASE SEND RESULTS OF MILL TEST REPORT, X–RAY, AND ULTRASONIC TEST REPORT ALONG WITH ORIGINAL BILL OF LADING IMMEDIATELY UPON SHIPPING. THESE REPORTS MUST BE SENT TO US PRIOR TO ARRIVAL OF MATERIAL IN HOUSTON.

Sharp testified that she remembers the order because it was ten times the size of Inter-Equip's usual order. She recalls that she telephoned Heiman to inform him that it was ready to be picked up, and he came to her office the same day, November 2, 1977, stating that he picked it up personally because it was one of the biggest orders he had ever received, that he acknowledged acceptance of the order by signing the original, and that he took the original and one copy with him, leaving only the signed copy with Inter-Equip. Ms. Sharp testified that Heiman's hand-written notation "shipping instructions pending" referred to the means of transportation. She recalls that Heiman visited her office several times after signing the order and she does not recall any visit by him in January.

Mr. Heiman, to the contrary, testified that he does not recall signing or receiving the written order, and that he did not pick it up at Sharp's office in November. He recognizes the signature on the form as his, concludes he must have signed it, and supposes that he did so when he delivered the manufacturer's test reports to Sharp's office shortly after January 27, 1978. He testified that he wrote "shipping instructions pending" because by January Sharp was in the process of altering the original shipping instructions. Heiman testified that he did not take the time to read the order or notice that it indicated hemispherical, rather than elliptical heads and did not take a copy of the purchase order with him. According to Spears, Alloy first received a copy of Inter-Equip's written purchase order in July 1978 when, not finding one in his file, Spears obtained one from Mr. Hernandez directly. Contrary to Sharp's testimony that she kept only the signed copy and gave Heiman the original and another copy, the copy Alloy received from Hernandez in 1978 (Third-party Defendant's Alloy Exhibit No. 7) contains no signature by Heiman.

Heiman testified, that he understood, without reading the written purchase order,

---

**3.** Defendant Inter-Equip objected to testimony by Heiman regarding Inter-Equip's oral purchase order as a violation of the Parole Evidence Rule. That rule bars evidence of prior or contemporaneous oral agreements which vary a final written contract. It does not, however, exclude testimony that the parties did not intend the writing to be binding or evidence of subsequent agreements or modifications. Thus, Heiman's testimony is not barred by the rule.

that the heads would be shipped to Alloy's Houston warehouse and that he was to contact Sharp upon their arrival in Houston. Inter-Equip's usual shipping practice is to follow its customer's instructions and, unless it's impossible, to check the product, not by inspection, but by comparing the bill of lading with its purchase order prior to preparing the invoice. Ms. Sharp testified that in this case she stayed in touch with Heiman after she gave him a copy of the purchase order in order to keep on schedule for delivery, and that she subsequently learned that, due to the size of the heads, Alloy would not handle them. Then, in January, before production was complete, she discovered Phoenix was running four weeks late. She requested Mr. Heiman to help expedite delivery and he instructed her to contact the manufacturer directly. Phoenix informed her that the heads were too heavy and too large to ship by truck, and that while stored outside the steel had frozen together so that it could not load them for shipment until they thawed. Ms. Sharp worked with Phoenix over a period of weeks to change delivery. Mr. Hernandez then recommended to EPN that, in order to save money and time, Inter-Equip ship the heads directly from Delaware to the Mexican border at Laredo, and EPN accepted the recommendation.

Although Ms. Sharp generally was a credible witness, the evidence compels the conclusion that Mr. Heiman did not see or sign the defendant's written purchase order until January, 1978. The only testimony regarding means of transport was Sharp's statement that Phoenix informed her, in December or January, that it could not ship the heads by truck. It appears that Alloy did receive Inter-Equip's order in January 1978. The fact that Alloy's invoice to Inter-Equip contained, verbatim, the instructions regarding test reports included in Inter-Equip's written purchase order is additional evidence that Alloy received Inter-Equip's written order by March or April of 1978.

There is no question that Inter-Equip's bill of lading and invoice showed that the heads were hemispherical, and that the test reports which the manufacturer issued to Alloy and Alloy forwarded to Inter-Equip showed they were elliptical. On receiving the documents, Sharp, without reading them herself, distributed them to the bank, EPN's agent at the border and EPN in Mexico.

On February 2, 1978 six elliptical heads were shipped, uncrated on railroad flatcars, from the manufacturer in Claymont, Delaware to plaintiff's freight forwarder in Laredo, Texas. The freight forwarder's duties, according to plaintiff, were to arrange transportation across the Mexican border, pay duties and other expenses and to declare to the Mexican government what particular product was being imported. The import permit (Plaintiff's Exhibit No. 5), which had been prepared in advance, described the heads as hemispherical. Although plaintiff's freight forwarder usually determines that plaintiff has received what it ordered, in this case he did not physically inspect the heads and failed to notice the discrepancy between the test reports indicating elliptical heads and the bill of lading, invoice and import permit indicating hemispheric heads. He shipped the heads from Laredo into Mexico by rail on March 11, 1978 (Plaintiff's Exhibit No. 15). The heads reached Mexico City on April 26, 1978, forty-six days later, were unloaded by crane and, for convenience according to plaintiff's former President, Mr. Eduardo Cuevas, were stored in the open, twenty miles from Mexico City at the site of EPN's new Cautitlan plant, which was undergoing construction. Mr. Cuevas testified that plaintiff took for granted that the heads were conforming. Although EPN had a quality control staff in Mexico City whose responsibility it is to physically check the dimensions and specifications of products against shop drawings and who would easily have detected the nonconformity the heads, remained uninspected at the plant site for 65 days until plant construction was complete and plaintiff began manufacturing.

Inter-Equip invoiced EPN on March 1, 1978, before the heads reached Laredo (Plaintiff's Exhibit No. 13), and EPN paid Inter-Equip by letter of credit on March 16,

1978, five days after the heads left Laredo (Defendant's Exhibit No. 4). Inter-Equip paid Alloy on April 24, 1978, forty-four days after the heads came into the possession of plaintiff in Laredo and two days before they reached Mexico City (Defendant's Exhibit No. 15).

Plaintiff discovered that the heads were elliptical rather than hemispheric, and thus could not withstand the pressure for which the separators Pemex had ordered were designed, on June 30 or July 1, 1978, and immediately notified Inter-Equip. Inter-Equip did not question the non-conformity but contended it was not at fault because it had ordered hemispherical heads from Alloy. Inter-Equip contacted Heiman at Alloy, and reported to EPN that Alloy would not accept return of the heads because they were specially made and the manufacturer, Phoenix, would not accept their return. EPN wrote to Inter-Equip on July 7, 1978 requesting return of the heads and the refund of EPN's money (Plaintiff's Exhibit No. 19), Inter-Equip refused and advised EPN to sue Inter-Equip because Inter-Equip planned to sue Alloy. According to Mr. Gustavo Saavedra, EPN's in-house counsel who travelled to Houston with other EPN officers in an attempt to reach an agreement with Inter-Equip, Inter-Equip maintained that it was not at fault, and that it did not have sufficient money to refund, and that it could not dispose of the heads if EPN returned them. Alloy apparently claimed it had ordered from Phoenix what Inter-Equip ordered and refused to produce its invoices to Inter-Equip on the ground that Inter-Equip's purchase order was placed by telephone.

EPN testified that it did not ship the heads back to Inter-Equip because of the difficulty of proving importation of elliptical heads, the cost and the high risk that its money would not be returned. Inter-Equip testified that it instructed EPN not to purchase conforming heads elsewhere until it got a final refusal from Alloy and Phoenix.

When it did get that refusal Inter-Equip's president, Mr. Hernandez, offered to re-order the heads for EPN for an additional $45,000, Inter-Equip's cost. EPN's general manager, believing EPN needed the heads immediately in order to comply with its contract with Pemex which called for completion of the separators by March, 1979, and knowing that Inter-Equip would have to find a manufacturer of conforming heads and could not assure timely delivery, sought a quicker supplier. In addition, Mr. Saavedra testified that EPN had lost confidence in Inter-Equip. EPN called several suppliers seeking conforming heads that were already in the process of manufacture and placed an order with American Alloy Steel in October, 1978 at a cost of $20,000 more than that offered by Inter-Equip. EPN also sold the non-conforming heads in October, 1978 to Pemex for use on other tanks, for $55,000, thus making a $10,000 profit on the heads.[4]

With regard to notification of non-conformity, Hernandez testified that the time limitation for making claims in the case of a local delivery is generally from seven to thirty days, that in local deliveries United Parcel Service requires claims to be filed within seven days, and that some of Inter-Equip's suppliers give it thirty days to make claims. He acknowledged that the thirty day limit would not necessarily apply to a shipment to Mexico. Hernandez noted that in this case Inter-Equip had incurred expenses and had attempted through Mr. Vilchis to place the non-conforming heads with another customer in Mexico, but Vilchis had reported that that would be "quite hard."

Hernandez testified that Inter-Equip would have accepted return of the heads and refunded EPN its money in three situations. First, if EPN reported the non-conformity by March 12, 1978, before Inter-Equip paid Alloy, Inter-Equip would not have paid Alloy and believed Alloy would find that reasonable. Second, if Alloy had

---

**4.** Mr. Saavedra, testified that a 35% annual interest rate in Mexico at the time reduced plaintiff's profit.

taken the heads back at any time, including July 1, 1978, Inter-Equip would also have taken them back. Third, if EPN notified Inter-Equip by March 17, 1981 or within forty-five days of March 2, 1978, the date of invoice, Inter-Equip would have accepted return of the heads. Hernandez stated that, although Inter-Equip does not have a policy on it, he feels that five to fifteen days is sufficient time for discovery of non-conformity by a buyer's agent at the border and that forty-five days is the outside limit for reporting non-conformity. Within that time, had Alloy refused to accept return of the heads and refused Inter-Equip's money, Inter-Equip would have sued Alloy and attempted to sell the non-conforming heads. However, Hernandez also indicated that Inter-Equip takes a flexible approach to non-conforming goods. He stated that he was surprised at Alloy's attitude in this case, and that Inter-Equip's usual practice, one it has followed two or three times, is to "work it out" with the manufacturer, and if that is not possible because, for example, the buyer's notification was beyond the manufacturer's time limitation, to absorb the loss itself.

Alloy testified that its practice with regard to shortages of raw materials in an out of state delivery is to require them to be reported within ten, twenty or thirty days. Alloy often ships to Mexico and directly to Mexico City, and has gone through customs brokers which it regards as its customer, but it had not shipped by rail before. Alloy was aware from prior dealings with Phoenix of that company's policy of refusing to accept return of special orders. In this case, Alloy attempted to return the heads to Phoenix but Phoenix refused. Finally, according to Mr. Spears, Alloy would have taken the heads back and refunded Inter-Equip its money, despite Phoenix's refusal, if Alloy had thought it was at fault. Phoenix, according to the testimony of both Inter-Equip and Alloy, would not accept return of a specially ordered and manufactured product, at any time.

## THE LAW

The Court has jurisdiction of the parties and the subject matter in controversy under 28 U.S.C. § 1332(a)(2) because the action is between a citizen of a state and a citizen of a foreign state and the amount in controversy exceeds $10,000 exclusive of interest and costs. Venue properly lies in this district pursuant to 28 U.S.C. § 1391(a) and (c).

Plaintiff makes three alternative claims under the Texas Business and Commerce Code, each of which turns on the reasonableness of the time in which plaintiff notified defendant of non-conformity of the heads. The Court notes at the outset that the questions of reasonableness of time are "[t]he most persistently litigated yet perpetually confused" and "[t]he most vexatious" questions in rejection, revocation, and breach of contract cases and that "[b]oth the cases and the Code are full of disheartening platitudes on timeliness." White & Summers *Handbook of the Law Under the Uniform Commercial Code* 309, 421 (2d ed. 1980).

Plaintiff's first argument is that it did not accept the heads. It claims that because the heads were not used but stored it did not do any act inconsistent with Inter-Equip's ownership of the heads under the terms of § 2.606(a)(3) [5], and that the contract between plaintiff and defendant re-

---

**5.** § 2.606(a) provides:

Acceptance of goods occurs when the buyer (1) after a reasonable opportunity to inspect the goods signifies to the seller that the goods are conforming or that he will take or retain them in spite of their non-conformity; or

(2) fails to make an effective rejection (Subsection (a) of Section 2.602), but such acceptance does not occur until the buyer has had a reasonable opportunity to inspect them; or

(3) does any act inconsistent with the seller's ownership; but if such act is wrongful as against the seller it is an acceptance only if ratified by him.

The numbering of the subsections in the Texas statute is different from that in the UCC. Thus, UCC § 2.606(1)(a) is designated as "§ 2.606(a)(1)" in the Tex.Bus. and Com.Code Ann. (Vernon 1968).

quired payment by letter of credit prior to inspection, the non-conformity did not appear without inspection, and therefore the payment did not, by virtue of § 2.512,[6] "constitute an acceptance of [the heads] or impair [its] right to inspect or any of its remedies." The law supports plaintiff's position on these two points. *See e.g. Pacific Products, Inc. v. Great Western Plywood, Ltd.*, 528 S.W.2d 286 (Tex.Civ.App.1975); *Bowen v. Young*, 507 S.W.2d 600, 603 (Tex. Civ.App.1974).

Plaintiff asserts its "right" under § 2.513(a)[7] before "... acceptance to inspect [the heads] at any reasonable place and time and in any reasonable manner" and argues that since Inter-Equip was authorized to send the heads to plaintiff, it could inspect them after their arrival in Mexico. The official commentary to § 2.513, at n. 3, states "[i]t is not necessary that the buyer select the most appropriate time, place or manner to inspect or that his selection be the customary one in the trade or locality, that "the reasonableness [of the time] will be determined by trade usages, past practices and other circumstances of the case," and that "the place of arrival of shipped goods is a reasonable place for their inspection." In this case no evidence of relevant past practice or trade usage was submitted by the parties. The heads were shipped and place of their arrival was the Cautitlan plant outside Mexico City. *See T. J. Stevenson & Co., Inc. v. 81,193 Bags of Flour*, 629 F.2d 338, 358 (5th Cir. 1980) (where the Court of Appeals for the Fifth Circuit distinguished between the place of delivery and the place of arrival, and held that the point of acceptance turns on the duty to inspect and that under § 2.513, although delivery of flour for purposes of the letter of credit was to Mobile, Alabama, the buyer had no duty to inspect until the shipped goods reached the place of arrival, in Chile). The Court concludes that plaintiff EPN was not at fault in not inspecting the heads in Laredo but might have waited until they reached Mexico City.

█ In addition, plaintiff argues that it did not accept the heads, under § 2.606(a)(2), because it made an effective rejection of the heads "within a reasonable time after delivery" and "seasonably notified" defendant Inter-Equip as required by § 2.602(a)[8]. Reasonable time for the purpose of rejection after acceptance is measured from the date of delivery, rather than from the time by which the buyer should have discovered non-conformity.[9] Although the heads were not received in Mexico City until April 24, 1978, their receipt in Laredo by plaintiff's forwarding agent constituted

**6.** § 2.512 provides:

(a) Where the contract requires payment before inspection, non-conformity of the goods does not excuse the buyer from so making payment unless

(1) the non-conformity appears without inspection; or

(2) despite tender of the required documents circumstances would justify injunction against honor under the provisions of this title (Section 5.114).

(b) Payment pursuant to Subsection (a) does not constitute an acceptance of goods or impair the buyer's right to inspect or any of his remedies.

**7.** § 2.513(a) provides:

Unless otherwise agreed and subject to Subsection (c), where goods are tendered or delivered or identified to the contract for sale, the buyer has a right before payment or acceptance to inspect them at any reasonable place and time and in any reasonable manner. When the seller is required or authoriz-

ed to send the goods to the buyer, the inspection may be after their arrival.

**8.** § 2.602(a) provides:

Rejection of goods must be within a reasonable time after their delivery or tender. It is ineffective unless the buyer seasonably notifies the seller.

**9.** The commentators contrast the notice requirement of § 2.607(3)(a) for breach of contract which is a condition to any remedy, to the requirement of § 2.602(1) the condition to the remedy of rejection commenting that,

[t]he rejection notice should normally come earlier in time for it must be given a reasonable time after "delivery or tender," whereas § 2.607 notice must be given within a re~son able time after the buyer discovers or should have discovered the breach .... [I]t is fair and proper that the buyer who seeks to reject should be required to give notice and to act more quickly than one who seeks only to recover damages.

White & Summers, *supra*, at 426.

delivery under the terms of plaintiff's purchase order.

Section 2.606(a)(2) provides that acceptance does not occur until the buyer has had "a reasonable opportunity to inspect" the goods. Thus, the reasonable time for rejection must take into account time for inspection which in this case is upon their arrival of the heads in Mexico. Section 1.204(b) of the Texas Bus. & Com.Code provides generally that "what is a reasonable time for taking any action depends on the nature, purpose and circumstances of such action." In this case the action is notice of rejection; its purpose is to inform the seller that the buyer rejects the goods in sufficient time to give the seller opportunity to cure, and to assist in minimizing the buyer's losses.

White & Summers, *supra*, at 309 suggest four "circumstances" relevant to the reasonableness of time: the difficulty of discovery of the defect; the terms of the contract; the relative perishability of the goods; and the course of performance after sale and before rejection. The durability of the heads in this case and the lack of contract provisions requiring inspection within a definite time argue in plaintiff's favor. The fact that it was a special order and that there was no communication between the parties from the time of delivery to notification of non-conformity favor defendant. As to difficulty of discovery White & Summers note, *id.*, note 47, at 310, "[t]he nature of the defect, the complexity of the goods

and the sophistication of the buyer may all influence the difficulty of discovery." *See Harrington Manufacturing Co., Inc. v. Logan Tontz Company*, 40 N.C.App. 496, 253 S.E.2d 282, *cert. denied*, 297 N.C. 454, 256 S.E.2d 806 (1979).

The defect in this case was total and blatant. The goods were not complex in design and the buyer was a merchant, under § 2.104(a) and producer of sophisticated oil industry equipment. Although an argument can be made that the non-conformity of the heads was difficult to discover in Laredo because the freight forwarder lacked the expertise to discern whether the large steel forms piled on a flatcar were elliptical or hemispheric, when the heads arrived at the Cautitlan plant in Mexico they might have been inspected by EPN's quality control staff who were located only twenty miles away who would have discovered the non-conformity without difficulty had they inspected the heads.[10] In addition, plaintiff had the duty as well as the opportunity, as did defendant and third-party defendant, to discover the discrepancy between the hemispheric and elliptical heads in the paperwork by reviewing and comparing the documents related to the sale. EPN's freight forwarder failed, as had Inter-Equip and Alloy's employees, to discover the difference between the bill of lading and invoice on the one hand and the materials test report and manufacturer's partial data report on the other.[11] The

**10.** White & Summers, suggest that the degree of difficulty affects the length of time which is reasonable. The more difficult, the longer time is deemed reasonable for the buyer's discovery and notice of non-conformity. They also write, "[o]ne commentator has written that '[i]f any pattern is emerging it is that the more severe the defect, the greater the time within which the buyer has the right to invoke the remedy, . . .'" citing Dusenberg, *General Provisions, Sales, Bulk Transfers and Documents of Title*, 28 Bus.Law 805, 827 (1973). However, the authors believe it will be a rare case in which a business buyer is given substantial additional time in which to reject because the defect was difficult to discover *supra*, at 310.

*See, e.g., Michael M. Berlin & Co., Inc. v. T. Whiting Manufacturing, Inc*, 5 UCC REP 357, 360 (1968) (where the court found, "an inspection of steel to determine its thickness could

have been made with a minimum of effort. The inspection presented no difficulty . . . No analysis was required. . . .")

**11.** Defendant argues that the illegality of the freight forwarder's action in transporting elliptical heads over the border, under documents authorizing the transport of hemispherical heads, waives plaintiff's right to reject for non-conformity. Defendant offers, and the Court finds, no basis for such a defense in law. Plaintiff sues for breach of contract and defendant does not claim that the contract was illegal.

It is true that had plaintiff's freight forwarder notified plaintiff, defendant or third-party defendant of the discrepancy by March 11, 1978, prior to payment by either plaintiff or defendant, Inter-Equip would have accepted return of the heads. Alloy might also have accepted

Court concludes that plaintiff did not notify defendant of rejection within the reasonable time after delivery and that it therefore accepted the non-conforming heads.

■ Plaintiff's next argument is that it accepted the heads but properly revoked acceptance under § 2.608(a) and (b)[12] because: the elliptical shape of the heads "substantially impair[ed their] value" to EPN; it accepted the heads "without discovery of [the] nonconformity;" its "acceptance was reasonably induced . . . by the difficulty of discovery before acceptance;" and the revocation "occur[red] within a reasonable time after plaintiff discover[ed] or should have discovered the ground for it." There is no question that the elliptical shape of the heads substantially impaired their value to plaintiff and that plaintiff accepted them without discovery of nonconformity. With regard to whether revocation was timely, "[t]he criterion is not when the events occurred, but whether, under all of the circumstances, the act was taken within a reasonable time after [the buyer] discovered or should have discovered his grounds for revocation. V.T.C.A. Bus. & Com.C. §§ 1.204(b), 2.608(b) (1968)." *Sylvester v. Watkins*, 538 S.W.2d 827, 830–31 (Tex.Civ.App.1976). For the reasons discussed above in relation to rejection the Court finds that plaintiff should have discovered the non-conformity of the heads shortly after they arrived in Mexico on April 24, and should have revoked its acceptance within a matter of weeks, not months, of that time. In addition, plaintiff did not show, and given the proximity of its quality control staff, could not show, that the difficulty of discovery induced its acceptance of the heads *after* they were delivered in Mexico. The Court, therefore, concludes that plaintiff did not revoke its acceptance of the non-conforming heads.

■ Finally, plaintiff argues that it accepted the heads but, pursuant to § 2.607(c)(1),[13] notified Inter-Equip of its breach of contract "within a reasonable time after it discovered or should have discovered the breach," and that plaintiff is therefore entitled to damages for non-conformity under § 2.714[14]. White & Sum-

---

their return based on its error in failing to compare the written and oral purchase orders.

However, it is not clear that the freight forwarder had a legal duty to physically inspect the heads. *See e.g. Ward v. Baltimore Stevedoring Co.*, 437 F.Supp. 941 (E.D.Pa.1977), where the court dismissed a tort claim against a freight forwarder on the ground that his functions were ministerial and he had "no duty to independently investigate to determine whether shipments were dangerous."

**12.** § 2.608 provides in relevant part:

(a) The buyer may revoke his acceptance of a lot or commercial unit whose non-conformity substantially impairs its value to him if he has accepted it . . .

(2) without discovery of such nonconformity if his acceptance was reasonably induced either by the difficulty of discovery before acceptance or by the seller's assurances.

(b) Revocation of acceptance must occur within a reasonable time after the buyer discovers or should have discovered the ground for it and before any substantial change in the condition of the goods which is not caused by their own defects. It is not effective until the buyer notifies the seller of it. Comment 4 to § 2.608 states that the "reasonable time for revocation of acceptance should extend in most cases beyond the time in which notification of breach of contract must

be given, beyond the time for discovery of nonconformity after acceptance and beyond the time for rejection after tender." White and Summers, *supra* at 309, n. 45, explain that this means that a buyer who has complied with the § 2.607 notice requirement (notification that the transaction is troublesome) still usually has an additional time to revoke. Here plaintiff notified defendant of revocation as soon as it discovered breach due to non-conformity.

**13.** § 2.607 provides in relevant part:

. . . (c) Where a tender has been accepted (1) the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy; and . . .

(d) The burden is on the buyer to establish any breach with respect to the goods accepted.

**14.** § 2.714(a) provides:

Where the buyer has accepted goods and given notification (Subsection (c) of Section 2.607) he may recover as damages for any non-conformity of tender the loss resulting in the ordinary course of events from the seller's breach as determined in any manner which is reasonable.

mers, *supra*, at 421–2 outline the policies behind the notice of breach of contract requirement of § 2.607 as: to enable the seller to make adjustments or replacements or suggest opportunities for cure to the end of minimizing the buyer's loss and reducing the seller's own liability to the buyer; to afford the seller an opportunity to arm himself for negotiation and litigation; and less importantly, to give the defendant seller the same kind of mind balm he gets from the statute of limitations.

As discussed in relation to rejection and revocation, the Court finds that, under the circumstances, plaintiff should reasonably have discovered non-conformity soon after the heads reached Mexico. Whether the time between April 24, 1978 and July 1, 1978 is reasonable depends, again, on the nature, purpose and circumstances of the action, in this case the required notification of breach. Plaintiff argues that its failure to inspect, discover and notify between April 24, 1978 and July 1, 1978 was not prejudicial because Phoenix and therefore Alloy and Inter-Equip would not have taken the heads back even on April 24.

The claim of lack of prejudice to the seller, Inter-Equip is, in effect, an argument that timely notice by plaintiff EPN of non-conformity would not have served the purpose of enabling Inter-Equip to make adjustments or suggest opportunities for cure towards the end of reducing Inter-Equip's liability to EPN. In this case, defendant Inter-Equip even as late as two months after the arrival of the heads in Mexico attempted to make adjustments and cure the non-conformity. Although plaintiff notified defendant of non-conformity well beyond the 45 day period, Inter-Equip contacted its agent Vilchis regarding the sale of the elliptical heads in Mexico. When that failed, it offered to reorder the hemispheric heads at Inter-Equip's cost and, perceiving that EPN lacked confidence in Inter-Equip, suggested plaintiff contact Alloy and Phoenix directly. EPN, for its part, rejected Inter-Equip's attempts at adjustment, subsequently paid $20,000 more than Inter-Equip's price for the conforming hemispheric heads and sold the non-con-forming heads at a $10,000 profit. Had EPN notified Inter-Equip two months earlier, Inter-Equip clearly would have been in a better position to cure the non-conformity. Inter-Equip's position with Alloy did not change after April 24, but given Inter-Equip's flexible approach to the problem of non-conforming goods, it seems probable that notification of non-conformity within a reasonable time as contemplated in the Texas Business and Commerce Code would have obviated this lawsuit. The Court concludes that under these circumstances plaintiff did not notify defendant of its breach of contract within a reasonable time from the point at which it should have discovered the non-conformity and, therefore, that plaintiff is not entitled to damages.

In sum, plaintiff accepted the non-conforming heads, and did not revoke its acceptance or notify defendant of breach of contract within a reasonable time as required by statute. Therefore, judgment is GRANTED to defendant.